Irving Younger, J.
For several years now, lawyers concerned with the administration of criminal justice have been troubled by the problem of “dropsy” testimony. This case shows why.
*64 The facts are simple. On July 23, 1970, Patrolman Charles Frisina arrested defendant James McMurty on a charge of possession of marijuana. McMurty moved to suppress the marijuana for use as evidence, and, in due course, a hearing was held. Frisina took the stand. In condensed but substantially verbatim form, he testified as follows:
“At 8:30 p.m. on July 23, 1970, I was on duty driving a patrol car. While stopped for a light at West 3rd Street and Broadway, I observed two men in a doorway of the building at 677 Broadway. One of these men — James McMurty, as I later learned — saw the patrol car and stepped out of the doorway. From his right hand he let drop a small plastic container. I got out of the patrol car and retrieved it. In my opinion, based upon a fair amount of experience, its contents were marijuana. I approached McMurty, who had begun to walk away, and asked him if the container was his. He said no. I said that I had seen him drop it and placed him under arrest.”
Then McMurty took the stand. In condensed but substantially verbatim form, he testified as follows:
“ On July 23, 1970, at 8:30 p.m., I was walking on Broadway near West 3rd Street when I saw Patrolman Frisina coming toward me. I knew that I had a container of marijuana in my pocket. I also knew, after twelve years of involvement with drugs and four or five prior convictions, that illegal-search- and-seizure was my only defense. The last thing I would do is drop the marijuana to the ground. I simply left it in my pocket. Frisina told me to get into a doorway. I obeyed, hoping that he would search me. He did just that, found the marijuana, and arrested me.”
The prosecutor stands on Frisina’s testimony. Since the marijuana had been abandoned, he argues, its seizure was lawful. Defense counsel stands on McMurty’s testimony. The arrest occurred when McMurty was ordered into the doorway, he argues, and since the officer then had no probable cause to arrest, the search which followed was unlawful.
Were this the first time a policeman had testified that a defendant dropped a packet of drugs to the ground, the matter would be unremarkable. The extraordinary thing is that each year in our criminal courts policemen give such testimony in hundreds, perhaps thousands, of cases — and that, in a nutshell, is the problem of “ dropsy” testimony. It disturbs me now, and it disturbed me when I was at the Bar. (Younger, “ The Perjury Routine ”, in The Nation, May 8, 1967, p. 596):
“Policemen see themselves as fighting a two-front war— against criminals in the street and against ‘ liberal ’ rules of *65 law in court. All’s fair in this war, including the use of perjury to subvert ‘ liberal ’ rules of law that might free those who ‘ ought ’ to be jailed * * * It is a peculiarity of our legal system that the police have unique opportunities (and unique temptations) to give false testimony. When the Supreme Court lays down a rule to govern the conduct of the police, the rule does not enforce itself. Some further proceeding * * * is almost always necessary to determine what actually happened. In Mapp v. Ohio, for example, the Supreme Court laid down the rule that evidence obtained by the police through an unreasonable search and seizure may not be used in a state criminal prosecution. But before applying the rule to any particular case, a hearing must be held to establish the facts. Then the judge decides whether those facts constitute an unreasonable search and seizure. * * * The difficulty arises when one stands back from the particular case and looks at a series of cases. It then becomes apparent that policemen are committing perjury at least in some of them, and perhaps in nearly all of them. Narcotics prosecutions in New York City can be so viewed. Before Mapp, the policeman typically testified that he stopped the defendant for little or no reason, searched him, and found narcotics on his person. This had the ring of truth. It was an illegal search (not based upon 1 probable cause ’), but the evidence was admissible because Mapp had not yet been decided. Since it made no difference, the policeman testified truthfully. After the decision in Mapp, it made a great deal of difference. For the first few months, New York policemen continued to tell the truth about the circumstances of their searches, with the result that evidence was suppressed. Then the police made the great discovery that if the defendant drops the narcotics on the ground, after which the policeman arrests him, the search is reasonable and the evidence is admissible. Spend a few hours in the New York City Criminal Court nowadays, and you will hear case after case in which a policeman testifies that the defendant dropped the narcotics on the ground, whereupon the policeman arrested him. Usually the very language of the testimony is identical from one case to another. This is now known among defense lawyers and prosecutors as ‘ dropsy ’ testimony. The judge has no reason to disbelieve it in any particular case, and of course the judge must decide each case on its own evidence, without regard to the testimony in other cases. Surely, though, not in every case was the defendant unlucky enough to drop his narcotics at the feet of *66 a policeman. It follows that at least in some of these cases the police are lying.”
So far as I know, there has been only one statistical study of “ dropsy ” complaints. (Barlow, Patterns of Arrests for Misdemeanor Narcotics Possession: Manhattan Police Practices 1960-62; 4 Grim. L. Bull. 549 [1968].) It confirms my impressions (pp. 556-557): “ In the period after Mapp, the number of complaints alleging that the suspect dropped the contraband increased for all groups of officers. The Narcotics Squad showed the smallest percentages increase (45.3 per cent), although the rise in the number of their ‘ dropsies ’ (93, from 205 to 298) was the largest. The plainclothesmen recorded a 71.8 per cent rise in complaints based on this circumstance, an increase from 32 to 55; while the uniformed officers showed the highest percentage increase (79.6 per cent), with the number of complaints alleging drops rising from 69 to 128. ’ ’
Beyond any doubt, then, the problem exists. Its solution, I suppose, is prosecutors’ work. The courts can only deplore. They are ill-equipped to persuade the police to change their practices or alter their philosophy. In Judge Weight’s words (Veney v. United States, 344 F. 2d 542, 543 [concurring opn.], cert. den. 382 U. S. 865), “ the time is ripe for some soul searching in the prosecutor’s office before it offers any more [‘ dropsy ’ testimony].”
Withal, Judges must decide the cases that come before them. In this case, my reasoning has taken four steps.
First. 1 ‘ Dropsy ’ ’ testimony should be scrutinized with especial caution.
I am aware that in Bush v. United States (375 F. 2d 602, 604) Judge (as he then was) Burger wrote, with respect to narcotics policemen: “ But it would be a dismal reflection on society to say that when the guardians of its security are called to testify in court under oath, their testimony must be viewed with suspicion. ’ ’
With all possible deference, I disagree. When there are grounds for believing that ‘ ‘ the guardians of its security ’ ’ sometimes give deliberately false testimony, it is no “ dismal reflection on society ” for Judges to acknowledge what all can see. If courage is the secret of liberty, Whitney v. California (274 U. S. 357, 375, Brahdeis, J., concurring), the first task of free men is to call things by their right name.
Second. Should the policeman’s testimony seem inherently unreal, it will forthwith be rejected. This, is a consequence of the first consideration.
*67 Here, the evidence given by neither "witness strikes me as against the grain of human experience. If Frisina’s testimony stood alone, I could believe it. If McMurty’s testimony stood alone, I could believe it.
Third. The slightest independent contradiction of the policeman’s testimony or corroboration of the defendant’s testimony will warrant suppression of the evidence. This too is a consequence of the first consideration.
Here, there was not independent contradiction of Frisina and no independent corroboration of McMurty. The testimony of each remains poised in the balance.
Fourth. Determine whether the burden of proof has been carried.
Had the issue been open, I would hold that the People must prove beyond a reasonable doubt that the seizure was lawful. But the issue is closed. The Court of Appeals declares the burden of proof to be the defendant’s. (People v. Baldwin, 25 N Y 2d 66, 70.) Where the testimony on one side balances the testimony on the other, as here, it is the People who prevail. Defendant’s motion to suppress is therefore denied.
I come to this decision reluctantly. Our refusal to face up to the “ dropsy ” problem soils the rectitude of the administration of justice. One is tempted to deal with it now by suppressing ‘ ‘ dropsy ’ ’ evidence out of hand; yet I cannot. Reason and settled rules of law lead the other way, and Judges serve the integrity of the means, not the attractiveness of the end.
Somehow, policemen must be made to understand that their duty is no different.