THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RUSSELL S. ASH, Defendant-Appellant.

Fourth District    No. 4—02—0838

Opinion filed February 23, 2004.

Michael J. Pelletier and Jeffery A. Waldhoff, both of State Appellate Defender's Office, of Chicago, for appellant.

Barney S. Bier, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and Anastacia R. Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE APPLETON delivered the opinion of the court:
A jury found defendant, Russell S. Ash, guilty of possession of a

controlled substance (less than 15 grams) (720 ILCS 570/402(c) (West 2002)). Ash appeals on four grounds: (1) the trial court violated Supreme Court Rule 608(a)(9) (177 Ill. 2d R. 608(a)(9)) and his right to due process by allowing *voir dire* to proceed off the record; (2) defense counsel rendered ineffective assistance by waiving the reporting of *voir dire*; (3) the trial court erroneously admitted evidence of an uncharged crime, possession of drug paraphernalia (720 ILCS 600/3.5(a) (West 2002)); and (4) the evidence was too weak and improbable to support the conviction. We affirm.

## I. BACKGROUND

The State charged that on February 4, 2002, Ash knowingly and unlawfully possessed methamphetamine.

A Quincy police officer, Shannon Pilkington, testified that at 1:20 a.m. that day, he was patrolling the city in his squad car when he noticed a state trooper had pulled someone over. He stopped and got out to help. The trooper arrested the driver for driving under the influence and asked the passenger, a woman in a miniskirt, to step outside so he could search the vehicle. It was icy out and close to zero, and Pilkington told her she could wait in his squad car, if she liked, where it was warm. She accepted. "I did a quick pat[-]down of her person," Pilkington testified, "I didn't actually search her pockets." She climbed into the backseat. When the trooper said it was all right for the woman to leave, Pilkington let her out of the squad car and "searched the [backseat] area *** and underneath both the driver's and passenger seats," shining his flashlight, "to see if that female" (as he called her) had "left any contraband." He saw nothing.

A little over an hour later, Pilkington helped to arrest a man, wanted on a warrant, who was standing in the bay of an automatic car wash, beside a Chevrolet Blazer. Ash, a passenger in the Blazer, got out and gave Pilkington permission to search his person. (Because the search and seizure of Ash's person are not at issue in this appeal, we express no opinion thereupon.) He searched the front and back pockets of Ash's pants as well as his coat pockets. In the right jeans pocket, he found "a nylon pouch that contained a glass vial and a glass tube. It also contained a *** small metal tin. *** It appeared that the glass tube was a snort tube *** [f]or ingesting methamphetamine or cocaine." Users of methamphetamine commonly placed the drug "on the foil" and "plac[ed] the lighter underneath *** it[,] *** heating it up and then ingesting the fumes from the foil through a tube." Pilkington arrested Ash for possession of drug paraphernalia, handcuffed his hands behind his back—securely, so he could not get his hands loose—and put him in the backseat of the squad car, where

he sat for 10 to 15 minutes. No one else had been in the backseat since the woman in the miniskirt left.

Pilkington testified he then drove Ash to police headquarters, three blocks away, for booking. After parking the squad car in the police parking garage and walking around to the back door of the squad car to get Ash out, Pilkington saw, through the window, a white object on the back passenger floorboard. He pretended not to see it. "I did not know if he had anything else on him[,] and I didn't want any problems at this time," he testified. "I didn't want the evidence to be destroyed by [his] stepping on it or pushing it far underneath the seat." He took Ash out of the squad car, locked the car, and escorted him to an interview room.

In the well-lit police headquarters, Pilkington realized, for the first time, that Ash was wearing not one but two jackets, one on top of the other. He had searched the outer jacket but not the inner one. He then searched the inner jacket and in the right front pocket found a stack of coffee filters. "Coffee filters," he testified, "are commonly used in the manufacture of methamphetamine. The product is poured through the filters to filter out the ingredients that you don't want." He then returned to the squad car and picked up the white object from the floorboard. "It was *** a small plastic bag that contained another plastic bag that had a white powdery substance [resembling] methamphetamine. The outer [B]agg[ie] looked [as if] it had been ripped open."

The powder in the plastic bags field-tested positive for methamphetamine, and the crime laboratory confirmed, by more thorough testing, that it was indeed methamphetamine, 2.5 grams of it. The laboratory saw no residue, however, on any of the items that Pilkington had found in Ash's pants pocket and therefore did not test those items. Testing of the coffee filters proved inconclusive. On the plastic bags, the laboratory found no fingerprints "suitable for comparison."

The jury found Ash guilty of possessing methamphetamine, a Class 4 felony, for which the trial court sentenced him to three years' imprisonment. This appeal followed.

## II. ANALYSIS

### A. Waiving the Reporting of *Voir Dire*

Before trial, the trial court asked both the prosecutor and defense counsel if they wanted *voir dire* to be reported. Both declined. Ash argues that by allowing *voir dire* to proceed without a court reporter, the trial court violated Rule 608(a)(9) and his right to the due process of law. He also argues his defense counsel rendered ineffective assistance by waiving the reporting of *voir dire*. He cites *Entsminger v.*

*Iowa*, 386 U.S. 748, 18 L. Ed. 2d 501, 87 S. Ct. 1402 (1967), among other authorities.

Unlike the Iowa statute in *Entsminger*, 386 U.S. at 749-50, 18 L. Ed. 2d at 503, 87 S. Ct. at 1402-03, Illinois Supreme Court Rule 608(a) requires that the record on appeal be exhaustively inclusive. See 177 Ill. 2d R. 608(a) (listing the numerous items that "[t]he record on appeal must contain"). Iowa law required the compilation of merely a skeletal record on appeal, unless the defense counsel affirmatively requested a fuller record. *Entsminger*, 386 U.S. at 749-50, 18 L. Ed. 2d at 503, 87 S. Ct. at 1402-03. Not so with Illinois law. See 177 Ill. 2d R. 608(a). For that reason alone, *Entsminger* is distinguishable.

■ Rule 608(a) requires, among other things, that "the court reporter *** take full stenographic notes of the proceedings regarding the selection of the jury." 177 Ill. 2d R. 608(a)(9). To our knowledge, no court has ever interpreted Rule 608(a) to require trial courts to second-guess defense counsel when they expressly waive any of the requirements of that rule. It was the responsibility of Ash, not the trial court, to preserve an adequate record for this appeal. See *People v. Leonard*, 171 Ill. App. 3d 380, 389, 526 N.E.2d 397, 403 (1988); *People v. Smith*, 106 Ill. 2d 327, 334-35, 478 N.E.2d 357, 361 (1985). The trial court asked defense counsel if he wanted *voir dire* reported, and he said no. Ash spoke and acted through his attorney, and the trial court could rely on that answer. See *People v. Tucker*, 183 Ill. App. 3d 333, 335, 539 N.E.2d 243, 244 (1989).

■ If defense counsel made objectively demonstrable errors that were sufficiently prejudicial to the defense, Ash has a constitutional right to a new trial. See *Strickland v. Washington*, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984). Ash must show, however, "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

■ Failing to memorialize *voir dire* does not deprive a defendant of " '*all* hope of *any* [adequate and effective] appeal *at all*.' " (Emphases added.) *Entsminger*, 386 U.S. at 752, 18 L. Ed. 2d at 504, 87 S. Ct. at 1404, quoting *Lane v. Brown*, 372 U.S. 477, 485, 9 L. Ed. 2d 892, 898, 83 S. Ct. 768, 773 (1963). The record in this appeal is hardly comparable to the bare-bones " 'clerk's transcript' " in *Entsminger*, which lacked even a transcript of the trial or the attorneys' briefs and arguments (*Entsminger*, 386 U.S. at 749, 18 L. Ed. 2d at 503, 87 S. Ct. at 1402-03). Excusing the court reporter from taking notes of *voir dire* is not, in and of itself, ineffective assistance (*People v. Thompkins*, 121 Ill. 2d 401, 448, 521 N.E.2d 38, 59 (1988)) or a violation of due process (*People v. McClurg*, 195 Ill. App. 3d 381, 388, 552 N.E.2d 290, 294

(1990); *People v. Culbreath*, 343 Ill. App. 3d 998, 1005, 798 N.E.2d 1268, 1273 (2003)).

### B. Evidence of Another Crime, Possession of Drug Paraphernalia

■ The State charged Ash with possessing a controlled substance (720 ILCS 570/402(c) (West 2002)), not with possessing drug paraphernalia (720 ILCS 600/3.5(a) (West 2002)). Nevertheless, over defense counsel's objection, the trial court allowed Pilkington to testify that he found drug paraphernalia in Ash's pockets. Ash argues the court thereby violated the rule against evidence of other crimes. See *People v. Heard*, 187 Ill. 2d 36, 58, 718 N.E.2d 58, 71 (1999).

Ash had to do more than object to Pilkington's testimony; he had to renew the objection in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Having failed to do that, he invokes the doctrine of plain error. See 134 Ill. 2d R. 615(a); *People v. Vargas*, 174 Ill. 2d 355, 363, 673 N.E.2d 1037, 1041 (1996). We find no error at all in the trial court's ruling, let alone plain error.

Evidence of other crimes is admissible for any relevant purpose other than proving the defendant had a propensity to commit crime. *Heard*, 187 Ill. 2d at 58, 718 N.E.2d at 71. To illustrate: if the State charged a defendant with theft, evidence that the defendant possessed drug paraphernalia would serve no apparent purpose other than proving the defendant was a bad person and, therefore, just the type of person who would steal. The evidence would be inadmissible. *Cf. People v. Barnes*, 182 Ill. App. 3d 75, 83-84, 537 N.E.2d 949, 954 (1989) (lack of relationship between the charged offense of unlawful use of a weapon and the possession of a large amount of cash).

Obviously, in the present case, proving that Ash was a bad person was not the State's purpose in presenting evidence that he possessed drug paraphernalia. The paraphernalia had a greater significance. Because it was precisely the type of paraphernalia one would use to smoke methamphetamine, the paraphernalia was arguably related to the packet of methamphetamine Ash was charged with possessing.

"Relevant" evidence is evidence having any tendency to make the existence of a fact that is important to the verdict more or less probable than it would otherwise be. *People v. Capporelli*, 148 Ill. App. 3d 1048, 1056, 502 N.E.2d 11, 16 (1986). The State had to prove that Ash "knowingly possessed" the packet of methamphetamine that Pilkington found on the floorboard of his squad car. See 720 ILCS 570/402 (West 2002). If Pilkington found, in Ash's jeans pocket, the equipment for smoking methamphetamine and, in his jacket pocket, a stack of coffee filters, would those facts have any tendency to make it more probable, in the mind of a reasonable person, that Ash knowingly pos-

sessed the methamphetamine that Pilkington found at his feet? Of course it would. One would naturally be more inclined to believe the methamphetamine belonged to Ash if he had, in his pockets, the equipment for using it as well as coffee filters for making it—not because Ash is a "bad egg" but because, in common experience, people do not normally carry around this peculiar assortment of items unless they handle methamphetamine. See *Norville v. State*, 83 S.W.3d 112, 115 (Mo. Ct. App. 2002) (evidence of contemporary possession of drug paraphernalia relevant to show the defendant knowingly possessed controlled substance).

Relevance does not end the inquiry. Even if the evidence of another crime is relevant to some purpose other than proving a propensity to commit crime, the trial court still must decide whether the prejudicial effect of the evidence substantially outweighs its probative value. *People v. Placek*, 184 Ill. 2d 370, 385, 704 N.E.2d 393, 400 (1998). We will defer to the trial court on that question unless the trial court clearly abused its discretion (*Placek*, 184 Ill. 2d at 385, 704 N.E.2d at 400), *i.e.*, unless it is clear that no reasonable person could agree with the trial court (*People v. Harper*, 251 Ill. App. 3d 801, 804, 623 N.E.2d 775, 777 (1993)).

Ash argues that for the following reasons, the paraphernalia was "far more prejudicial than probative": (1) the police found no residue of methamphetamine on the paraphernalia, (2) the State never charged him with possession of drug paraphernalia, (3) possession of drug paraphernalia and possession of methamphetamine were "so similar," and (4) the evidence that he possessed the methamphetamine was "scant." The conclusion does not logically follow from those premises.

A court should not exclude evidence of other crimes merely because the evidence is prejudicial; one may expect the State to introduce evidence prejudicial to the defendant. Rather, the prejudicial effect of the evidence must be considerably greater than the ability of the evidence to shed light on any issue in the case. See *Placek*, 184 Ill. 2d at 385, 704 N.E.2d at 400. We do not see how the absence of drug residue detracted significantly from the probative value of the paraphernalia. Residue or no residue, the items were plainly drug paraphernalia and could not have been anything else. Equally plainly, they were paraphernalia suitable for the use and manufacture of methamphetamine, the type of illegal drug the State had charged Ash with possessing.

As for the second premise—that the State never charged Ash with possession of drug paraphernalia—that is, of course, always true of evidence of other crimes: "other" crimes are, by definition, crimes

other than those charged in the present case. See *People v. Houston*, 288 Ill. App. 3d 90, 97, 679 N.E.2d 1244, 1248 (1997). To hold that evidence of other crimes is more prejudicial than probative simply because the crimes are uncharged would be tantamount to barring all evidence of other crimes. The two-part analysis in *Placek* (relevance and then the weighing of probative value against prejudicial effect) would be an exercise in futility because "the snake would always eat its tail" in the second part of the analysis.

We agree that possessing methamphetamine and possessing the paraphernalia for smoking it are logically related (or, to use Ash's word, "similar"). That "similarity" increases rather than decreases the probative value of the paraphernalia. In fact, "to be admissible" at all, "other-crimes evidence *must* have 'some threshold similarity to the crime charged.' " (Emphasis added.) *People v. Donoho*, 204 Ill. 2d 159, 184, 788 N.E.2d 707, 722 (2003), quoting *People v. Bartall*, 98 Ill. 2d 294, 310, 456 N.E.2d 59, 67 (1983).

If, as Ash argues, the evidence of his possession of methamphetamine was "scant," that could not have been a reason to exclude the evidence of his possession of the drug paraphernalia. The State has a right to present evidence that, in the view of common sense, tends to bolster its case. Constructive possession of a controlled substance often rests upon circumstantial evidence, and possession of drug paraphernalia tends to corroborate the knowing possession of the drug itself lying nearby. See *People v. Harris*, 52 Ill. 2d 558, 561, 288 N.E.2d 385, 387 (1972) (possession of needle, tie rag, and eyedropper were relevant to the question of knowing possession of heroin); *People v. Whalen*, 145 Ill. App. 3d 125, 129, 132, 495 N.E.2d 122, 125, 127 (1986); *People v. Walton*, 221 Ill. App. 3d 782, 786-87, 583 N.E.2d 28, 32 (1991).

We find no clear abuse of discretion in the trial court's decision to admit the evidence that Ash possessed drug paraphernalia.

## C. Sufficiency of the Evidence

■ Ash argues that Pilkington's "dropsy testimony" is inherently incredible. A "dropsy case" is one in which a police officer, to avoid the exclusion of evidence on fourth-amendment grounds, falsely testifies that the defendant dropped the narcotics in plain view (as opposed to the officer's discovering the narcotics in an illegal search). G. Chin & S. Wells, *The "Blue Wall of Silence" as Evidence of Bias and Motive to Lie: A New Approach to Police Perjury*, 59 U. Pitt. L. Rev. 233, 248-49 (1998). This is not a "dropsy case." Because Ash had consented to a search of his person, Pilkington had no reason to lie to cover up an illegal search. Ash appears to be arguing, however, that if, as some com-

mentators suggest, police routinely lie in "dropsy cases" (A. McClurg, *Good Cop, Bad Cop: Using Cognitive Dissonance Theory to Reduce Police Lying*, 32 U.C. Davis L. Rev. 389, 400 (1999); *People v. McMurty*, 64 Misc. 2d 63, 65-66, 314 N.Y.S.2d 194, 196 (N.Y. Crim. Ct. 1970)), they are not above lying in other cases as well, including this one.

When Pilkington searched Ash at the car wash, the search was, Ash says, "so thorough that he found a small piece of folded-up aluminum foil in [his] pocket." Ash argues: "It is highly unlikely that such a thorough search of Ash's person would have failed to turn up a packet of drugs." We disagree. If this so-called "thorough search" failed to turn up a thick stack of coffee filters in his coat pocket, one could readily conceive how it failed to turn up a Baggie of 2.5 grams of methamphetamine.

According to Ash, a reasonable jury would have had to disbelieve Pilkington when he testified that Ash, "with his hands securely handcuffed behind his back, while seated in a police car, and while wearing layers of thick winter clothes," could "contort himself," with "Houdinian flexibility and dexterity," so as to "reach some inner part of his clothing[,] where the [B]aggie was located, and *** remove those drugs from the clothing," only to "drop[ ] the drugs onto the floor of the police cruiser." Actually, Pilkington never stated the methamphetamine necessarily came from Ash's inner jacket. He merely expressed his opinion, on cross-examination, that if Ash were "limber" enough, he could have reached a pocket of his inner jacket while sitting in the squad car with his hands cuffed behind him. Even if one disagreed with that opinion, we do not see how it can be fairly characterized as a *lie*.

Moreover, Pilkington's opinion does not strike us as so implausible that one would have to reject it. Depending on how loose the clothing is, one can visualize someone, seated, hands cuffed behind the back, reaching under the outer jacket, grasping the back of the inner jacket, and pulling the side pocket around to the back. Perhaps the Baggie was ripped open because of the difficulty of pulling it out of a pocket of the twisted inner jacket. Alternatively, Ash could have slipped off his shoe and dumped out the Baggie or pulled it out of the seat of his pants, without being a contortion artist. He had 10 to 15 minutes to do so.

Pilkington testified he thoroughly inspected the back of the squad car after letting the woman out. One might at first feel inclined to remark, "How convenient," but, on further reflection, one could understand why a police officer would, even should, make a point of inspecting the back of the squad car immediately after letting pas-

sengers out. A passenger could leave something of value and accuse the officer of theft or extortion. Often, passengers are associated with illegal drugs or other unsavory activities and, as the present case demonstrates, pat-down searches are not foolproof.

In short, we will not retry Ash. Instead of asking ourselves whether we ourselves would have returned the same verdict, we will view the evidence in a light most favorable to the prosecution and ask whether any rational jury could have found Ash guilty, beyond a reasonable doubt, of possession of a controlled substance. See *People v. Hagberg*, 192 Ill. 2d 29, 33-34, 733 N.E.2d 1271, 1273 (2000). To quote a case on which Ash relies, we do not find the evidence to be "contrary to human experience and unworthy of belief." *People v. Cunningham*, 333 Ill. App. 3d 1045, 1050, 777 N.E.2d 478, 483 (2002), *appeal granted*, 202 Ill. 2d 679, 787 N.E.2d 176 (2003). Just because of the plenitude of "dropsy cases," we will not require, as a matter of law, the corroboration of a police officer's testimony.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.