# Illinois Official Reports

## Appellate Court

---

### *People v. Campbell*, 2019 IL App (1st) 161640

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeANGELO CAMPBELL, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-1640 |
| Filed | April 9, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-9396; the Hon. Alfredo Maldonado, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Richard Connor Morley, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    DeAngelo Campbell was found guilty of aggravated unlawful use of a weapon and sentenced to one year in prison. On appeal, Campbell contends that the State failed to prove him guilty beyond a reasonable doubt because the police officers' testimony was not credible and there was no physical evidence linking him to the gun. Specifically, Campbell argues that it is inherently incredible that he would have dropped the gun he was accused of possessing in plain view of the officers.

¶ 2    While we are not insensitive to Campbell's claim about the systemic credibility problems created by this so-called "dropsy" testimony, we affirm because, after viewing the evidence in the light most favorable to the State, we conclude that the officers' testimony was not so unworthy of belief as to render the trial court's finding of guilt unreasonable.

¶ 3                                                    Background

¶ 4    Campbell was charged with nine counts of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2016)) stemming from a traffic stop. Campbell waived his right to a jury trial.

¶ 5    At trial, Chicago police officer Michael Laurie testified that on the night of May 31, 2015, he was working with a team of officers patrolling the area near the 4700 block of South Ellis Avenue due to recent shootings between gangs. Laurie, along with his partner, Officer Steven Hefel, was in a covert vehicle. Five other police officers—Richard Sanchez, Osbiel Montoya, Goetz, Suing, and Stevan Vidljinovic—were in two other covert vehicles. All three vehicles were traveling on Ellis Avenue and in constant radio communication.

¶ 6    At 4722 South Ellis Avenue, Laurie saw a white Dodge Durango illegally double-parked and obstructing traffic. The lead vehicle, occupied by Goetz, Suing, and Vidljinovic, passed the Durango and stopped in front of it. The other two vehicles, including the one Laurie was in, parked behind the Durango. Following communication with the lead vehicle that they had identified the smell of cannabis emanating from the Durango, the officers conducted a narcotics investigation. Laurie, Sanchez, Montoya, Goetz, Suing, and Vidljinovic approached the Durango, which drove about five feet before stopping. None of the officers had their weapons drawn at this point. When Laurie was about 12 to 15 feet away from the Durango, the right rear passenger door opened and Campbell began running. Laurie instructed him to get back inside the Durango. Campbell did so.

¶ 7    As Campbell was returning to the Durango, Laurie saw him retrieve a handgun with a wooden grip, later identified as a Smith & Wesson .38-caliber revolver, from his waistband and throw it onto the floorboard of the back seat. Campbell then got in and shut the door. On seeing the gun, Laurie drew his service weapon and immediately began yelling "gun" to inform the other officers, who were surrounding the vehicle. Though nighttime, there was street lighting and lighting from the police vehicles' headlights. Laurie and Montoya removed Campbell from the Durango and placed him in custody. Laurie then informed Vidljinovic, who was on the other side of the Durango, about the handgun located on the floorboard so that he could recover it. Laurie identified two other individuals, who were in the driver's seat and the front passenger seat of the Durango. The incident happened within seconds.

¶ 8    Chicago police officer Vidljinovic testified that he was patrolling the area near a covert vehicle with Officers Goetz and Suing. Four other officers were also patrolling in two covert vehicles. He saw an illegally double-parked Dodge Durango that was obstructing traffic. Vidljinovic's vehicle passed the Durango, and he smelled an odor of cannabis. Vidljinovic stopped in front of the Durango, and the other two covert vehicles parked behind it.

¶ 9    Vidljinovic, Goetz, and Suing approached the Durango without their weapons drawn and announced their office. The Durango shifted gears and drove in the direction of the officers, at which time Vidljinovic and the other two officers drew their weapons. The Durango came to an abrupt stop after traveling a few feet. The three occupants were instructed to park and show the officers their hands. The two individuals in the front complied, but Vidljinovic could not see Campbell, who was in the back seat. The rear passenger's side door opened, and he heard some commotion. After hearing the passenger's side door shut, he approached and opened the rear driver's side door. Officers Laurie and Montoya were securing Campbell on the other side. Laurie informed Vidljinovic of the handgun, which he located on the floorboard underneath the back seat and secured. He also confirmed that it was loaded and later inventoried.

¶ 10   Officer Vidljinovic prepared a police report with the input and observations from the other officers. The report served as a summary of events that occurred. The other officers had the opportunity to review and edit the report. Absent from the report was Laurie seeing Campbell trying to get away from the vehicle before being instructed to return to it. The report stated that Campbell placed the handgun inside, as opposed to tossing it, as testified to by Laurie.

¶ 11   Chicago police officer Montoya testified that, as he and the other officers approached the Durango, he saw Campbell, who was about 10 to 12 feet away, getting out and moving towards the curb at a fast pace. He heard Laurie direct Campbell to get back inside, which he did. As Campbell approached the Durango he tossed a large object with a brown handle onto the back seat floorboard, later identified as a handgun. Montoya and Laurie then detained Campbell.

¶ 12   The State introduced a certification that Campbell did not have a firearms owner's identification card. The State closed, and Campbell moved for a directed verdict, which the trial court denied.

¶ 13   Sayna Williams, Campbell's girlfriend, testified that she has resided with Campbell for many years. On that night, he contacted her to tell her he was coming home and would need her to let him into the apartment. When he arrived, Williams was standing at the front door to the building. She saw the Durango stop in front. Williams knew what kind of car Campbell would be in and generally knew who else was in the car with him. She could see Campbell speaking with the individual in the passenger seat. Then, she saw him start to get out. Williams explained that Campbell only had one leg out of the Durango as the police quickly came up to him and told him to get out. She stated that she saw three police vehicles and at least five police officers. She was about 10 feet away, but the lighting was not good because the street lights were out. She attempted to learn why Campbell was being arrested, but the officers instructed her to go inside. Williams never saw Campbell with a handgun.

¶ 14   On cross-examination, Williams explained that Campbell did not have a key to the apartment because it cost $75. She also stated that she had not spoken with Campbell about his case even though they still resided together.

¶ 15   Campbell testified that he was at a family member's house and asked a friend for a ride to his apartment, which he and Williams shared. His friend drove the Dodge Durango. As Campbell said goodbye to his friends and began to get out, he saw the police officers, who

were yelling at him to get back in. He was then placed in handcuffs by one of the officers. Campbell stated that he did not have a handgun on his person at any point, he did not see a gun in the Durango at any time, and the Durango was crowded with "a lot of stuff." The defense rested.

¶ 16        In finding Campbell guilty on all nine counts of AUUW, the trial court made the following findings regarding the credibility of the witnesses. The court noted that every witness has a bias, but it found that the officers' testimony was consistent and credible and the varying terminology as to how the gun arrived on the floorboard was insignificant. The court had some issues with the credibility and consistency of Campbell and his girlfriend's testimony. Specifically, it was odd that Williams stated that she had not spoken to Campbell about the case and that Campbell did not have a key to an apartment where he had been living for several years. Campbell filed a motion for new trial, which was denied. The trial court later sentenced Campbell to the statutory minimum of one year in prison.

¶ 17                                        Analysis

¶ 18        Campbell argues that the evidence was insufficient to convict him on several grounds. He points to inconsistencies between the officers' testimony and the police reports. He notes the lack of physical evidence connecting him to the gun. He describes his own testimony as the more plausible version of events. Most importantly, however, he argues that the officers are incredible because it is beyond human experience to believe that he tossed the gun into the Durango in sight of the officers. This type of testimony is referred to as "dropsy" testimony. The State counters by minimizing the lack of physical evidence and downplaying the officers' inconsistencies as minor. The State also argues that, to the extent "dropsy" testimony exists, it is not a basis on which to categorically disbelieve the officers' testimony. While we have serious reservations about the plausibility of a suspect openly discarding contraband with knowledge of police presence, on the facts and in light of the standard of review, we ultimately agree with the State and affirm Campbell's conviction.

¶ 19        When faced with a challenge to the sufficiency of the evidence, we must determine whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could find all the elements of the crime proven beyond a reasonable doubt." *People v. White*, 2017 IL App (1st) 142358, ¶ 14. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL 121453, ¶ 37. The fact finder determines the credibility of witnesses, weighs the testimony, resolves conflicts in the evidence, and draws reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The deference given to the trier of fact's determinations has limits; the reviewing court may reverse a conviction where the evidence "is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 20        Campbell's argument that the officers cannot reasonably be believed depends in large part on his characterization of their testimony as "dropsy" testimony. A case involving "dropsy" testimony is one in which "a police officer, to avoid the exclusion of evidence on fourth-amendment grounds, falsely testifies that the defendant dropped the [contraband] in plain view." *People v. Ash*, 346 Ill. App. 3d 809, 816 (2004). Many courts trace the origin of this description of officer testimony to a decision out of the New York Criminal Court in *People v. McMurty*, 314 N.Y.S.2d 194 (Crim. Ct. 1970). See, *e.g.*, *United States v. Janis*, 428 U.S. 433,

447 n.18 (1976) (citing *McMurty*, 314 N.Y.S.2d 194); *State v. Brunori*, 578 A.2d 139, 142 n.6 (Conn. App. Ct. 1990) (same); *Ruiz v. State*, 50 So. 3d 1229, 1232-33 (Fla. Dist. Ct. App. 2011) (same).

¶ 21    In *McMurty*, a motions judge balanced competing testimony of an officer and defendant. The officer testified that, while on patrol, he saw the defendant step out of a doorway after seeing the police car. *McMurty*, 314 N.Y.S.2d at 195. He then dropped a small plastic container holding marijuana. *Id.* The defendant testified that he would never drop the container because he knew it contained marijuana and he knew that a challenge to any eventual search or seizure would be his best defense. *Id.* The judge, while he denied the defendant's motion to suppress, explained the problem of "dropsy" testimony in some detail.

¶ 22    The proliferation of "dropsy" testimony, according to *McMurty*, arises out of the United States Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961). See *McMurty*, 314 N.Y.S.2d at 196. The exclusionary rule, barring the admission of unlawfully obtained evidence in a criminal trial, only applied to federal prosecutions until *Mapp*. See 367 U.S. at 654-55. In *Mapp*, the court incorporated the exclusionary rule and held that it was enforceable against the states. *Id.* at 655.

¶ 23    Before *Mapp*, a local police officer who engaged in unconstitutional conduct—an arrest based on less than probable cause, for example—could still see the evidence admitted at trial. *McMurty*, 314 N.Y.S.2d at 196. In other words, a police officer could truthfully testify in state court that he or she stopped someone for no reason and the prosecution against that person would be unaffected. *Id.* After *Mapp*, an officer's truthful testimony that he or she stopped someone for no reason would result in suppression of the evidence. *Id.* So, "the police made the great discovery that if the defendant drops the [contraband] on the ground, after which the policeman arrests him, the search is reasonable and the evidence is admissible." *Id.* Put simply, *Mapp* led to police officers lying about their encounters with citizens to ensure that the evidence they unlawfully obtained would nonetheless be admitted later. *Janis*, 428 U.S. at 447 n.18 ("exclusionary rule tends to lessen the accuracy of the evidence presented in court because it encourages the police to lie in order to avoid suppression of evidence" (citing *McMurty*, 314 N.Y.S.2d 194)).

¶ 24    Illinois courts have similarly defined "dropsy" cases as those in which an officer falsely testifies that a defendant dropped contraband in plain view "to avoid the exclusion of evidence on fourth-amendment grounds." *Ash*, 346 Ill. App. 3d at 816. In *Ash*, however, the defendant made a far bolder claim, asserting that the mere existence of "dropsy" testimony in some cases meant that officers should be viewed as less trustworthy in *all* cases. *Id.* More recently, this court has viewed the phenomenon of "dropsy" testimony with skepticism, describing the "widespread nature" of this kind of testimony as "alleged[ ]" and based only on anecdotal evidence. *People v. Moore*, 2014 IL App (1st) 110793-B, ¶¶ 12-13, *appeal denied, judgment vacated on other grounds*, No. 117919 (Ill. Jan. 20, 2016).

¶ 25    Outside of Illinois, "dropsy" testimony has been acknowledged as a genuine problem confronting the criminal justice system. See, *e.g.*, *Janis*, 428 U.S. at 447 n.18 (citing "studies and commentary" showing that the exclusionary rule "encourages the police to lie *** to avoid suppression"); *United States v. Contreras*, 820 F.3d 255, 267 (7th Cir. 2016) (finding "cases in which defendants drop drugs in plain view invite skepticism" and noting scholarly documentation of "an increase of 'dropsy' cases" after *Mapp*); *Dixon v. State*, 327 A.2d 516, 517 (Md. 1974) (describing "dropsy" cases, along with inventory searches, as "afflict[ing] law

enforcement with the yawning credibility gap"). In New York, the problem was so pervasive that the police themselves named this kind of false testimony "testilying." Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 U. Colo. L. Rev. 1037, 1040 n.11 (1996) (citing City of N.Y., Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department: Commission Report 36 (1994)). Of particular relevance here, a New York City report regarding police corruption indicates that officers frequently "testilied" about things like traffic violations, observing bulges in pockets, or plain view sightings of guns or drugs to justify potentially unlawful searches and seizures. City of N.Y., Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department: Commission Report 38 (1994).

¶ 26    Of course, it is not enough for us to conclude that untruthful "dropsy" testimony exists; we also must be cognizant of the way courts have treated it. As we see it, there are essentially three categories of treatment of "dropsy" testimony. At one extreme, there are courts that decline to acknowledge at all that this type of testimony can be problematic. See *Moore*, 2014 IL App (1st) 110793-B, ¶ 13 (assuming, but refusing to say, that the evidence of "dropsy" testimony "actually establishes a trend or problem"). At the other extreme, courts have issued wholesale condemnations of this type of testimony. See *People v. Quinones*, 402 N.Y.S.2d 196, 198 (N.Y. App. Div. 1978) (rejecting officer's "dropsy" testimony "as a matter of law" where it has "all appearances of having been patently tailored to nullify constitutional objections"). But, the largest group of cases, including *McMurty*, sees "dropsy" testimony as a lurking saboteur of the fair administration of criminal justice while recognizing the testimony in each individual case must be evaluated for its own credibility. See, *e.g.*, *Contreras*, 820 F.3d at 267 ("Skepticism, however, does not suffice to supersede the trial court's credibility determination." (Internal quotation marks omitted.)); *Brunori*, 578 A.2d at 142 n.6 (acknowledging criticism of "dropsy" testimony but declining "to depart from the long standing rule that witness credibility *** is within the province of the jury"); *McMurty*, 314 N.Y.S.2d at 197 (finding "[b]eyond any doubt" that the "dropsy" problem exists, but concluding that "judges must decide the cases that come before them").

¶ 27    Critical whenever an officer testifies that the defendant dropped contraband in plain view is this question: would the officer's detention or search of the defendant have violated the fourth amendment if he or she had *not* seen the defendant drop the contraband in plain view? If the answer is "no," there is far less reason to doubt the credibility of the officer's testimony because the officer has nothing to gain by lying about the drop. If, however, the answer is "yes," both trial courts and courts of review should take care to analyze the credibility of the officer because the incentive to lie to avoid suppression of the evidence is at its highest.

¶ 28    Aside from a conclusory statement that, absent the plain view sighting of the gun, the officers "illegally searched the vehicle," Campbell does not argue that the officers' conduct would have violated the fourth amendment absent the "dropsy" testimony. The State does not mount a fourth amendment defense of the officers' conduct, instead arguing that this is not a "dropsy" case at all. We conclude that even without testimony about the observation of Campbell tossing the gun into the car, the officers' conduct likely comported with the fourth amendment giving them little incentive to fabricate a "dropsy" narrative.

¶ 29    Officers Laurie and Vidljinovic testified that the Durango was illegally double-parked. Vidljinovic also testified he could smell cannabis as he drove past the Durango. While we are skeptical that Vidljinovic would have been able to smell cannabis in his moving car, even if

the Durango's windows were open, the observation of a traffic violation is a valid reason to conduct a *Terry* stop. *People v. Hackett*, 2012 IL 111781, ¶ 20 (decision to stop a car is reasonable where officer has probable cause to believe that driver committed a traffic violation). Double-parking, or even stopping a car next to another car parked against the curb, violates the Illinois Vehicle Code. 625 ILCS 5/11-1303(a)(1)(a) (West 2016). Several officers testified that they pulled up to the Durango to do a "narcotics investigation," but even pretextual traffic stops are constitutional as long as the objective facts demonstrate cause for the stop. *Whren v. United States*, 517 U.S. 806, 812-13 (1996) ("In *United States v. Robinson*, 414 U.S. 218 (1973), we held that a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search' ***.").

¶ 30    Given that the stop was lawful, nothing in the record suggests that the officers' actions following the stop would have been unlawful. Our supreme court has said it is "well established that following a lawful traffic stop, police may, as a matter of course, order the driver and any passengers out of the vehicle pending completion of the stop without violating the protections of the fourth amendment." *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001). It is also well-settled that a police officer who sees contraband in a car from a lawful vantage point can then search the passenger compartment. See *People v. Colyar*, 2013 IL 111835, ¶¶ 38-43 (finding officers can conduct protective search of car where they see evidence of weapon in plain view (citing *Michigan v. Long*, 463 U.S. 1032 (1983))). Even accepting Campbell's testimony that "[t]here was stuff everywhere" in the back seat, there is no evidence to suggest that a gun on the floor would not have been visible to an officer outside of the car. A visible weapon would have allowed the officers to search the passenger compartment. See *Long*, 463 U.S. at 1049-50.

¶ 31    In sum, removing the testimony about the tossing of the gun and keeping everything else the same, we cannot say that there would have been any illegality to cover up as far as the fourth amendment is concerned. We are skeptical of the idea that a person, with knowledge of the presence of a police officer, would throw contraband in view of that officer. But, the recognized reasons for an officer to present untruthful "dropsy" testimony are not present and so no reason exists for us to intrude on the trial court's express credibility findings or second guess the officers' testimony that Campbell tossed the gun into the back seat.

¶ 32    Campbell also argues that the evidence was insufficient to convict him because the officers were otherwise incredible because (i) Officers Laurie and Vidljinovic testified that the Durango lurched forward five feet after the initial stop but Officer Montoya did not; (ii) Vidljinovic authored the police report but, as he did not directly observe the interaction with Campbell, had to rely on the narratives of other officers; and (iii) the report does not include information about Campbell attempting to run. We do not find these facts sufficient to reverse the judgment.

¶ 33    Campbell further argues that the State failed to prove him guilty beyond a reasonable doubt because the State did not present the gun itself or any other forensic evidence linking Campbell to the gun. It is settled law that if witnesses' testimony is otherwise credible, "the State [is] not required to present additional physical evidence that linked defendant" to the gun. See *People v. Daheya*, 2013 IL App (1st) 122333, ¶ 76. Having rejected Campbell's challenge to the officers' credibility, the absence of the gun itself from the evidence at trial does not alter our conclusion.

¶ 34      Campbell finally argues that, if he had a gun, the more logical course of action for him to take would have been to put it on the floor of the Durango before he got out. We agree this would have been the more logical course, but we do not always see logical responses to police presence from criminal suspects. See *People v. Henderson*, 33 Ill. 2d 225, 229 (1965) ("Far from being contrary to human experience, cases which have come to this court show it to be a common behavior pattern for individuals having [contraband] on their person to attempt to dispose of them when suddenly confronted by authorities."). We recognize that *Henderson* was decided only four years after *Mapp* and so the incentives to lie about this kind of behavior may not yet have become fully entrenched. We refer back, however, to our discussion of "dropsy" testimony and its origins—on the facts here, we cannot say that the officers would have been so overcome by a temptation to lie as to render their testimony incredible.

¶ 35      Affirmed.