2023 IL App (4th) 220035

NO. 4-22-0035

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 24, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| ISRAEL VENCES, | ) | No. 20CF79 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Cavanagh and Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1        In November 2021, a jury found defendant, Israel Vences, guilty of armed

violence and possession of methamphetamine. He was sentenced to consecutive terms of

imprisonment of 18 years for armed violence and 2 years for possession of methamphetamine.

Defendant appeals, arguing (1) the trial court erred in denying his motion to suppress; (2) the

State failed to prove him guilty of possession of methamphetamine beyond a reasonable doubt;

and (3) his conviction for possession of methamphetamine, the predicate offense for his armed-

violence conviction, must be vacated under the one-act, one-crime rule. We affirm.

¶ 2                                I. BACKGROUND

¶ 3        On June 25, 2020, defendant was a passenger in Kelsey Pratt's vehicle when Pratt

was stopped by an officer with the Metamora Police Department. Pratt's vehicle did not have a rear license plate. After the officer spoke with Pratt regarding the missing license plate, a deputy with the Woodford County Sheriff's Office arrived to perform a canine sniff around the vehicle. When the deputy asked defendant to step out of the vehicle, a methamphetamine pipe fell to the ground. Defendant ran. Methamphetamine was found on the passenger-side floorboard. A handgun was found near where defendant ran.

¶ 4        Defendant was charged with armed violence (720 ILCS 5/33A-2(a) (West 2020)) and possession of methamphetamine (720 ILCS 646/60(a)(b)(1) (West 2020)). In the charge for armed violence, the methamphetamine-possession offense served as the predicate offense: "[D]efendant knowingly committed the offense of Possession of Methamphetamine *** at a time the defendant was armed with a dangerous weapon, a *** handgun."

¶ 5        In May 2021, defendant filed a motion to suppress evidence he alleged to have been illegally obtained. Defendant argued the deputy who ordered defendant to exit the vehicle had no reasonable grounds to believe a crime had been committed.

¶ 6        In July 2021, a hearing on defendant's motion to suppress was held; Pratt was the first to testify. According to Pratt, she was driving her vehicle, a 1996 Oldsmobile, when she was stopped by the police near Metamora, Illinois, at approximately 8:46 p.m. Defendant was riding with Pratt. The officer told Pratt she did not have a registration plate on the back of her vehicle and asked for her identification and insurance information. The officer returned to his vehicle. When he returned to Pratt's vehicle, he asked for defendant's identification. Defendant did not have identification, so he gave the officer his name. Again, the officer went back to his vehicle. When he returned to Pratt's vehicle, he told defendant to get out of the car. Pratt was not sure the same officer who asked for her identification asked for defendant's. She was not sure there were

- 2 -

two officers on the scene. She did not see a dog other than the one that was sitting on defendant's lap.

¶ 7        On cross-examination, Pratt acknowledged she did not have a rear registration plate. The officer told Pratt he would give her a warning. When asked how much time had passed from the time she was stopped until the moment defendant exited her vehicle, Pratt estimated "[f]ive, ten minutes." After defendant exited the car, he ran. The officers told Pratt to exit the car.

¶ 8        On redirect examination, Pratt testified the officer said, "I'm going to have you step out of the car." When asked if she had gotten her ticket yet or the warning for the registration plate, Pratt stated, "I believe I did. I'm not 100 percent, though, if I got it before or after. But I believe I got it before."

¶ 9        Defendant, age 27, testified he saw Pratt give the officer her driver's license and insurance card. Another officer arrived at the scene. Defendant did not see a dog with that officer. After one of the officers told Pratt she did not have a rear license plate and asked her for her identification and proof of insurance, they did not ask her additional questions. The officer who walked up to defendant's side of the vehicle asked defendant for his identification. Defendant testified the officer who spoke to him was not the same officer who pulled over Pratt. The officer told defendant to "please step out of the vehicle."

¶ 10        On cross-examination, defendant testified that when he stood, the methamphetamine pipe that was on his lap fell and broke. When this happened, the officer reached for defendant's arm. Defendant turned and ran. The interaction at the passenger side of the car was "a short interaction." Defendant said the officer asked for his name, walked back to his vehicle (he believed), returned to Pratt's vehicle, and asked defendant to step out. Pratt was

his fiancée.

¶ 11　　　　When asked the reason he ran from the police, defendant testified, "I was on a lot of drugs." He stated, "[E]verything happened pretty fast." Defendant ran into the field. Defendant believed the time from when they were pulled over until he "ended up running" was "about 10 minutes." Defendant admitted dropping a handgun as he ran. "I know he didn't give her a written warning. We were waiting for—I do believe he walked back to the vehicle, and then he came back after he got my name. And then asked me to step out. There was no discussion about giving a warning. He didn't give her a piece of paper when—before I ran." Defendant did not see a police dog at the scene.

¶ 12　　　　The State called Jesse Polston, a deputy with the Woodford County Sheriff's Office. Deputy Polston testified he was requested to assist Metamora Officer Darren Donald with a free-air sniff by his canine partner. Deputy Colton Zehr, a field training officer, was with Polston. When Polston arrived at the scene of the stop, Donald was sitting in his squad car completing paperwork. While "continuously working on his paperwork," Donald talked to Polston, telling him he wanted a canine sniff of the vehicle. After talking to Donald, Polston approached the passenger side of the vehicle. Zehr approached the driver's side. Polston introduced himself to defendant and asked him to step out of the vehicle. At this time, Donald continued working on the paperwork. Defendant exited the vehicle. As he did, Polston heard glass break on the pavement. He looked and saw a methamphetamine pipe shattered on the ground. Upon seeing the pipe, Polston told defendant to face the car. Defendant pulled away and ran into a field. Both Zehr and Donald ran after him but did not catch him. They found a pistol near where defendant ran.

¶ 13　　　　Deputy Polston testified his conversation with Donald upon his arrival lasted less

than a minute. From the time Polston pulled up to the scene and the time defendant fled was approximately two-and-a-half to three minutes.

¶ 14 Deputy Darren Donald of the Woodford County Sheriff's Office testified that, on the date defendant was arrested, he was working as a Metamora police officer. Donald pulled over a vehicle for no rear registration. In that vehicle was a female driver, Pratt; defendant was the passenger. Donald approached the driver's side and explained the reason for the stop. Pratt had thought there was a license plate on the back of her vehicle. Donald intended to give Pratt a written warning for the violation. He asked defendant if he had identification. Defendant stated he did not, but he gave Donald his name. After he collected the information, the deputy walked back to his squad car. As he was walking, he contacted dispatch with his "mic pack" to request a canine unit. Donald did so "[b]ecause in my past dealings with [defendant] to my knowledge he's involved with narcotics" or methamphetamines. Donald testified that the call-in did not delay his traffic stop. At the squad car, the deputy began writing the written warning for Pratt. In so doing, he performed "a warrant check and standard operating procedure." Deputy Polston arrived shortly after, approximately "a few minutes" later. The stop was captured on the squad car's video.

¶ 15 After Deputy Polston arrived, Deputy Donald "told him why I had him on the traffic stop" and "informed him that in the past incident with [defendant] is that he has been known to have narcotics on him." While Donald continued writing the warning, Polston asked if Donald wanted a canine sniff of the vehicle. Donald replied he did. Polston approached the passenger side and began talking to defendant. Defendant stepped out of the car, took a couple of steps toward the back of the vehicle, and then ran into a wheat field. Donald took chase. Pratt did not exit the vehicle until after she was asked to. The free-air sniff did not take place.

- 5 -

¶ 16	After Polston informed Donald a methamphetamine pipe had broken, Donald searched the car for further contraband. He found a clear plastic bag with white residue and an ammunition magazine that matched the handgun that was found in the wheat field. The items were found in the passenger area of the vehicle.

¶ 17	The trial court began by explicitly applying the analysis of our decision in *People v. Musgrave*, 2019 IL App (4th) 170106, 141 N.E.3d 320. The court observed Pratt's vehicle was stopped at 9:28:50 p.m., and Deputy Polston arrived at 9:32:32 p.m., less than four minutes after the stop. When defendant ran at 9:34 p.m., according to the court, Deputy Donald was working on the paperwork. The court noted Donald could be heard verifying information with the dispatcher. The court found "no extension at all" of the time the individuals were detained; all was "done within the time frame of the initial traffic stop." The court further found the officer was permitted to ask defendant to step out of the vehicle and to conduct a canine sniff of the vehicle. Upon finding the officers "conducted themselves in accordance with the Constitution," the court denied the motion to suppress.

¶ 18	In November 2021, a jury trial was held. At the trial, Deputy Donald was the first to testify on behalf of the State. On June 25, 2020, Donald was on routine patrol in a squad car for the Metamora Police Department when he stopped Pratt's vehicle, due to the absence of a rear license plate. In the front passenger seat sat defendant. Defendant sat facing Donald, with his back "almost all the way to the passenger door." There was "a lot of stuff on the floorboards" of Pratt's vehicle.

¶ 19	After speaking to Pratt and defendant, the deputy walked back to his squad car. While walking back, Donald requested Deputy Polston, a canine handler, to respond to the scene. Inside the squad car, Donald performed records checks on Pratt and defendant. While Donald ran

those checks and began writing a warning for the missing license plate, Polston and Deputy Zehr arrived at the scene. Both were Woodford County sheriff's deputies. From his squad car, Donald observed defendant exit the vehicle. He saw Polston grab defendant's left wrist, defendant pull away, and defendant run into a field. Donald exited the squad car and, with Zehr, pursued defendant until they lost sight of him.

¶ 20       Deputy Donald returned to the location of the traffic stop. Polston handed Donald a cracked methamphetamine pipe and a magazine from a pistol. The magazine contained .40-caliber bullets. The area of the field where defendant ran was searched by Polston and his canine. Polston reported finding a firearm. Donald went to the location of the firearm, which was approximately 5 to 10 feet into the field. He took the firearm into evidence.

¶ 21       Deputy Donald testified to other evidence found at the scene. He found suspected methamphetamine and one loose .40-caliber round. The methamphetamine was inside a plastic cigarette case that was on top of trash on the front passenger-side floorboard of the vehicle. The suspected methamphetamine field-tested positive for methamphetamine.

¶ 22       On cross-examination, Deputy Donald testified that the vehicle belonged to Pratt. Trash covered the passenger-side floorboard to the extent he could not see the floor. The trash was maybe an inch high. Donald did not have the cigarette case or broken pipe tested. Donald believed, through his training and experience, that the pipe was a methamphetamine pipe, as it had distinctive curves on it. No evidence was fingerprinted or submitted for DNA testing.

¶ 23       Deputy Polston testified he is the canine handler for the Woodford County Sheriff's Office. In that role, Polston and his canine "do narcotics sniffs and tracks and things of that nature." On June 25, 2020, Polston was dispatched to a traffic stop. Deputy Zehr, who was undergoing field training, was with him. They responded in their squad car and arrived at the

scene within minutes. There, Polston planned to conduct a free-air sniff with his canine. Polston approached the passenger-side window, while Zehr went to the driver's side. Donald remained in his squad car completing paperwork. At the vehicle, Polston asked defendant to exit the vehicle. There was a dog in the vehicle. Defendant asked if he could get a lead for his dog before exiting. Defendant looked around the vehicle for a short time but stepped out without finding a lead.

¶ 24　　According to Deputy Polston, when defendant stepped out of the vehicle, Polston heard glass shattering on the pavement. Polston looked down and saw a broken methamphetamine pipe at defendant's feet. The rounded edges at the end of the pipe indicated it was a methamphetamine pipe, rather than "a crack pipe." At that point, the deputy decided to arrest defendant. He asked defendant to face the vehicle. Polston grabbed one of defendant's arms. Defendant pulled away and began running into a wheat field. Zehr and Donald took chase, while Polston stayed with the driver. From outside the vehicle, Polston observed a pistol magazine. He could not recall on what side of the vehicle it was found. Polston released his canine to do an "article search." Approximately 30 to 45 seconds later, the canine found the firearm.

¶ 25　　A forensic chemist with the Illinois State Police testified the white substance weighed 1.082 grams and tested positive for methamphetamine.

¶ 26　　The jury found defendant guilty of both charges. He was sentenced to consecutive sentences of 18 years' imprisonment for armed violence and 2 years' imprisonment for possession of methamphetamine.

¶ 27　　This appeal followed.

¶ 28　　　　　　　　　　II. ANALYSIS

¶ 29　　　　　　　　　　A. Motion to Suppress

¶ 30          Defendant first argues the trial court erred in denying his motion to suppress, as his constitutional right to be protected from an unreasonable seizure was violated when the traffic stop was unreasonably prolonged. Defendant points to Deputy Donald's calling for backup and his talking with Deputy Polston and maintains those actions caused Donald to halt the process of preparing the written warning and necessarily prolonged the stop. When tasked with reviewing an order denying a motion to suppress, this court "applies a bifurcated standard of review." *Musgrave*, 2019 IL App (4th) 170106, ¶ 44. Under this standard, we give great deference to the trial court's factual findings and reverse such findings only when they are against the manifest weight of the evidence. *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 49, 138 N.E.3d 46. However, no such deference is given to the ultimate finding of whether evidence should be suppressed. That determination is a question of law we review *de novo*. *Musgrave*, 2019 IL App (4th) 170106, ¶ 44.

¶ 31          Drivers and passengers are protected from unreasonable searches and seizures by both our state and federal constitutions. *People v. Harris*, 228 Ill. 2d 222, 231-32, 886 N.E.2d 947, 954 (2008) (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)); *Musgrave*, 2019 IL App (4th) 170106, ¶ 36 (citing U.S. Const., amend. IV, and Ill. Const. 1970, art. I, § 6). A traffic stop seizes the driver and any passenger. *Harris*, 228 Ill. 2d at 231.

¶ 32          The question of whether a traffic stop amounts to an unreasonable seizure involves consideration of up to three questions. First, a trial court may consider whether the traffic stop was lawful. *Musgrave*, 2019 IL App (4th) 170106, ¶ 36. Second, if the traffic stop was lawful, the court may determine whether the stop was impermissibly prolonged beyond the time the " 'tasks tied to the traffic infraction are—or reasonably should have been—completed." *Sadeq*, 2018 IL App (4th) 160105, ¶ 69, 138 N.E.3d 46 (quoting *Rodriguez v. United States*, 575

U.S. 348, 354 (2015)); see also *Musgrave*, 2019 IL App (4th) 170106, ¶¶ 36, 38. Third, if the stop was impermissibly prolonged, the court will consider whether the detention of the defendant was supported by a reasonable suspicion. *Sadeq*, 2018 IL App (4th) 160105, ¶ 36.

¶ 33 Defendant does not challenge the propriety of the traffic stop, meaning our review begins with the second question—whether the stop was impermissibly prolonged. As stated above, this involves a consideration of when the tasks tied to the initial stop are or reasonably should have been completed. *Id.* ¶ 69 (quoting *Rodriguez*, 575 U.S. at 354). In a routine traffic stop, the officer's tasks include "not only deciding whether to issue a ticket, but also activities such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' " *Id.* (quoting *Rodriguez*, 575 U.S. at 355). For a traffic stop involving a canine sniff, "[t]he critical question *** is not whether the sniff occurs before or after the officer issues a ticket, but whether conducting the sniff prolongs or adds time to the stop." *People v. Drain*, 2023 IL App (4th) 210355, ¶ 45 (citing *Sadeq*, 2018 IL App (4th) 160105, ¶ 69). In other words, the question is whether the sniff adds time to the stop. *Sadeq*, 2018 IL App (4th) 160105, ¶ 69.

¶ 34 Defendant's argument is misguided as the question is not simply whether the actions of Deputy Donald extended the stop; the question is whether the seizure was "prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). While Deputy Donald's conduct may have arguably extended the time for the stop, the stop was interrupted by defendant's own conduct and not completed. Before the time reasonably required to complete the deputy's mission of issuing the written warning, a methamphetamine pipe fell and defendant fled. At point, the detention of defendant was supported by a

reasonable suspicion. According to the trial court's factual findings, defendant fled less than six minutes from the time the stop began. Donald was, at that time, completing the paperwork for the warning. Defendant has provided no argument or case law to establish a written warning for a traffic violation reasonably should have been completed in under six minutes. Defendant's seizure during that time was not impermissibly prolonged. See, *e.g.*, *Sadeq*, 2018 IL App (4th) 160105, ¶¶ 10-11, 72 (finding the traffic stop for speeding, involving the preparation of a written warning, reasonably should have been completed at 11 minutes and 20 seconds into that stop). Defendant was not unconstitutionally seized.

¶ 35        Defendant's cases finding stops impermissibly prolonged are distinguishable. In *People v. Baldwin*, 388 Ill. App. 3d 1028, 1029-30, 904 N.E.2d 1193, 1194 (2009), the stop at issue exceeded 14 minutes. While the court found the officer in *Baldwin* was prepared to end the stop approximately 4½ minutes after it began, the court observed that officer was not preparing a citation or a written warning. *Id.* at 1035. In *People v. Thomas*, 2018 IL App (4th) 170440, ¶¶ 20, 24, 115 N.E.3d 325, the canine sniff occurred more than 13 minutes *after* the stop had *ended* and the defendant was told he was free to go.

¶ 36        The trial court did not err in denying defendant's motion to suppress.

¶ 37                                B. Sufficiency of the Evidence

¶ 38        Defendant next challenges his convictions by arguing the evidence at trial was insufficient to establish possession of methamphetamine beyond a reasonable doubt. Defendant emphasizes that the methamphetamine was not found on him, but among "a lot of trash and stuff" on the floorboard of Pratt's vehicle.

¶ 39        When reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the prosecution and decide whether any rational jury

could have found the defendant guilty beyond a reasonable doubt. See *People v. Ash*, 346 Ill. App. 3d 809, 818, 805 N.E.2d 649, 656 (2004). We will reverse a conviction on such a challenge only when the prosecution's evidence is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of [the] defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999).

¶ 40    To prove the offense of methamphetamine possession, the prosecution must prove the defendant knowingly possessed methamphetamine or a substance containing methamphetamine. See 720 ILCS 646/60(a) (West 2020). Generally, in cases involving controlled substances, proof of possession requires proving the defendant knew " 'of the presence of the narcotics and [had] immediate and exclusive control over them.' " *People v. Scott*, 2012 IL App (4th) 100304, ¶ 19, 966 N.E.3d 340 (quoting *People v. Morrison*, 178 Ill. App. 3d 76, 90, 532 N.E.2d 1077, 1086 (1988)). " 'Possession can be actual or constructive.' " *Id.* (quoting *Morrison*, 178 Ill. App. 3d at 90). For constructive possession of narcotics, the State must prove the defendant had the intent and the capability to maintain control over the narcotics. *Id.* A fact finder may infer constructive possession from facts showing the defendant " 'once had physical control with intent to exercise control in his own behalf, [the defendant] has not abandoned the drugs[,] and no other person has obtained possession.' " *Id.* (quoting *People v. McLaurin*, 331 Ill. App. 3d 498, 502, 772 N.E.2d 296, 300 (2002)). The evidence proving constructive possession is often entirely circumstantial. *Id.*

¶ 41    Here, the evidence is sufficient to support the determination that defendant constructively possessed methamphetamine. When Pratt's vehicle was stopped, Pratt was in the driver's seat and defendant was in the passenger seat. They were the only two people in the vehicle. As defendant exited the passenger side, a methamphetamine pipe fell at his feet.

- 12 -

"[P]ossession of drug paraphernalia tends to corroborate the knowing possession of the drug itself lying nearby." *Ash*, 346 Ill. App. 3d at 816. Defendant then fled the scene. Methamphetamine was found on the floorboard of the passenger side of the vehicle in a cigarette case on top of trash, not under it. The inference defendant possessed the recovered methamphetamine is not so unreasonable as to undermine the jury's finding of guilt.

¶ 42                                  C. One-Act, One-Crime

¶ 43         Defendant last argues that, in his convictions for armed violence and possession of methamphetamine, the predicate offense for the armed-violence offense violated the one-act, one-crime doctrine. Defendant largely relies on the First District's decision in *People v. Curry*, 2018 IL App (1st) 152616, in which the court found the defendant's convictions for both armed violence and possession of methamphetamine violated the one-act, one-crime doctrine.

¶ 44         The State disagrees, arguing the convictions and sentences for both offenses are proper as the legislature clearly intended to provide for cumulative sentences for both armed violence and its predicate offense. In support, the State points to the sentencing provisions in section 5/33A-3(d)(xii) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/33A-3(d)(xii) (West 2020)), a section not addressed in *Curry*.

¶ 45         Defendant acknowledges he failed to raise this issue at trial but maintains the issue is reviewable as plain error. To preserve a purported error for our review on appeal, a defendant must object at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Failure to complete either of these requirements results in the defendant's forfeiture of that claim. *Id.* The plain-error doctrine, however, allows this court to review an otherwise forfeited error when such error is clear or obvious and (1) the evidence is so closely balanced the error alone threatened to tip the scales of justice against the defendant or

- 13 -

(2) the error is so serious it affected the fairness of a defendant's trial and challenged the integrity of the judicial process. See *People v. Moon*, 2022 IL 125959, ¶ 21. The burden of proving the plain-error doctrine applies falls on the defendant. *Id.* While it is well-established that the second prong of the plain-error doctrine applies to forfeited one-act, one-crime arguments (see *People v. Nunez*, 236 Ill. 2d 488, 493, 925 N.E.2d 1083, 1086 (2010)), our first task is to determine whether defendant proved a clear or obvious error occurred. See *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).

¶ 46     "The assumption underlying the [one-act, one-crime] rule is that Congress ordinarily does not intend to punish the same offense under two different statutes." *Whalen v. United States*, 445 U.S. 684, 691-92 (1980). In general, the determination of whether the one-act, one-crime rule bars multiple convictions and sentences "involves a two-step analysis." *People v. Gillespie*, 2014 IL App (4th) 121146, ¶ 11, 23 N.E.3d 641 (citing *People v. Miller*, 238 Ill. 2d 161, 165, 938 N.E.2d 498, 501 (2010)). The first step is to decide "whether the defendant's conduct involved multiple acts or a single act." *Miller*, 238 Ill. 2d at 165. If, as here, the defendant was charged with multiple acts, the next step is to decide whether any of the charged offenses are lesser-included offenses. *Id.* "If an offense is a lesser-included offense, multiple convictions are improper." *Id.*

¶ 47     Using the analysis of *Miller*, defendant's charged conduct involved multiple acts—the possession of methamphetamine and the possession of a weapon. For those acts, defendant was convicted of armed violence and possession of methamphetamine. Defendant's armed-violence conviction is based on section 33A-2(a) of the Criminal Code (720 ILCS 5/33A-2(a) (West 2020)). Under section 33A-2(a), with a few specific exceptions, "[a] person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by

- 14 -

Illinois Law." *Id.* The "felony defined by Illinois Law" with which defendant was charged is possession of methamphetamine (720 ILCS 646/60(a), (b)(1) (West 2020)). As charged, defendant's possession-of-methamphetamine offense is the predicate felony for the armed-violence offense. For purposes of the one-act, one crime rule, "the predicate offense for another crime is a lesser-included offense of the other crime." *Gillespie*, 2014 IL App (4th) 121146, ¶ 14; see also *People v. Skaggs*, 2019 IL App (4th) 160335, ¶ 31, 137 N.E.3d 875. It thus seems that, under the two-step analysis of *Miller*, the one-act, one-crime rule applies.

¶ 48          Our inquiry is not, however, at an end. The one-act, one-crime rule does not bar all instances of multiple punishments for the "same act." As the United States Supreme Court has plainly held, the legislature has the authority to cumulatively punish an offender under two statutes, regardless of whether the two statutes ban the same conduct:

> "[W]here the court has determined that 'a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct ***, a court's task of statutory construction is at an end' and the imposition of such sentences in a single trial does not violate the Constitution." *People v. Payne*, 98 Ill. 2d 45, 54-55, 456 N.E.2d 44, 48-49 (1983) (quoting *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983)).

Case law establishes that the one-act, one-crime doctrine only bars cumulative sentences when the offenses bar the same conduct "*unless elsewhere specially authorized by [the legislature].*" (Emphasis in original.) *Hunter*, 459 U.S. at 367 (quoting *Whalen*, 455 U.S. at 691-92).

¶ 49          Our inquiry thus turns to the intent of the legislature and whether the General

- 15 -

Assembly authorized cumulative punishment for both armed violence and the predicate offense for an armed-violence conviction.

¶ 50    Defendant urges this court to follow *Curry* and find no clear intent of the legislature to allow cumulative punishments for armed violence and its predicate felony. In *Curry*, the defendant argued his conviction arising from the possession of heroin must be overturned as it was the predicate offense for his armed-violence conviction and the convictions for both violated the one-act, one-crime rule. *Curry*, 2018 IL App (1st) 152616, ¶ 23. The State pointed to section 5-8-4(d) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d) (West 2012)) and argued the modification of that section demonstrated a clear legislative intent the defendant be sentenced for both offenses. *Curry*, 2018 IL App (1st) 152616, ¶ 24. Section 5-8-4(d)(3) mandates that a court impose consecutive sentences when "[t]he defendant was convicted of armed violence based upon the predicate offense of *** controlled substance trafficking involving a Class X felony amount of controlled substance under Section 401 of the Illinois Controlled Substances Act [(720 ILCS 570/401 (West 2012))]." *Id.* ¶ 30 (quoting 730 ILCS 5/8-4(d)(3) (West 2012)). The *Curry* court found the State's argument unconvincing. The court determined the alleged "change" in the language of section 5-8-4(d)(3) did not demonstrate the argued intention, as the sponsor of the bill making the change made clear no substantive changes were made to the sentencing statute. *Id.* ¶ 31. In addition, the court found the statute at issue "is expressly directed to *sentencing*," containing "nothing to suggest intent to permit multiple *convictions*." (Emphases in original.) *Id.* ¶ 32. The *Curry* court interpreted the plain language of the statute as mandating a consecutive sentence "when there is an armed[-]violence conviction predicated upon certain enumerated felonies, *** any other convictions for which a defendant was sentenced must be served consecutively to the armed[-]violence conviction." *Id.* Finding

- 16 -

defendant's heroin conviction barred by the one-act, one-crime rule, the court vacated that conviction and sentence. *Id.* ¶ 33.

¶ 51 We note that this court, in *People v. Hunter*, 2022 IL App (4th) 210602-U, ¶ 35, relied on *Curry* and vacated that defendant's conviction and sentence for possession of methamphetamine. Our decision was based on the State's *concession* that the defendant's conviction should be vacated under the one-act, one-crime rule. *Id.* No argument regarding section 33A-3(d) of the Criminal Code was made, and no analysis by this court of the applicability of that section occurred.

¶ 52 Here, the State argues we should not follow *Curry*, as the *Curry* court did not consider section 33A-3(d). According to the State, section 33A-3(d) establishes that the legislature plainly intended defendant be sentenced under both the armed-violence offense and the predicate offense for armed violence. Section 33A-3(d)(xii) provides the following, in part:

> "For armed violence based upon a predicate offense listed in this
> subsection (d) the court shall enter the sentence for armed violence
> to run consecutively to the sentence imposed for the predicate
> offense. The offenses covered by this provision are:
>
> * * *
>
> (xii) a violation of the Methamphetamine Control and
> Community Protection Act." 720 ILCS 5/33A-3(d)(xii)
> (West 2020).

¶ 53 When construing a statute, we start with its plain language because the plain and ordinary meaning of statutory language " 'best indicates the legislature's intent.' " *Skaggs*, 2019 IL App (4th) 160335, ¶ 42 (quoting *People v. Burlington*, 2018 IL App (4th) 150642, ¶ 16, 99

- 17 -

N.E.3d 577). A plain reading of section 33A-3(d)(xii) clearly establishes the General Assembly specifically authorized cumulative punishment for armed violence and *the* predicate offense. See *Payne*, 98 Ill. 2d at 54-55 (noting the legislature's authority to provide for cumulative punishment). The language could not be clearer: the armed-violence sentence "shall *** run consecutively to the sentence imposed for *the* predicate offense." (Emphasis added.) 720 ILCS 5/33A-3(d) (West 2020).

¶ 54 Defendant contends, however, our analysis of legislative intent is limited to the statutory provisions that define the offenses and not to sentencing provisions. In support, defendant cites *People v. Sedelsky*, 2013 IL App (2d) 111042, ¶ 20, 997 N.E.2d 664, and *People v. Carter*, 213 Ill. 2d 295, 302, 821 N.E.2d 233, 237 (2004), and contends the question of legislative intent is limited to the legislature's "prescription of the 'allowable unit of prosecution.' " Defendant also highlights language from *Curry*, in which the court rejected the argument that the statute at issue demonstrated legislative intent after finding that statutory provision "is expressly directed to *sentencing*," containing "nothing to suggest intent to permit multiple *convictions*." (Emphases in original.) *Curry*, 2018 IL App (1st) 152616, ¶ 32.

¶ 55 We disagree. First, we find defendant's reliance on the "allowable unit of prosecution" argument unpersuasive. Such language and analysis appear in cases considering the question of whether "a prosecutor may treat each breach of a statute as a separate offense." *Carter*, 213 Ill. 2d at 302 (citing *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 220-21 (1952)). The two cases upon which defendant relies fall into this category. This case does not. In *Sedelsky*, the defendant had two convictions for possession of child pornography, based on the same image in the same digital medium under different file names. *Sedelsky*, 2013 IL App (2d) 111042, ¶ 11. In *Carter*, the issue was "whether multiple convictions can be entered for

- 18 -

unlawful possession of weapons by a felon based on the simultaneous possession of two handguns and the ammunition for those guns." *Carter*, 213 Ill. 2d at 297-98. Defendant has not cited one case where an "allowable unit of prosecution" analysis was used to ascertain whether a defendant could be sentenced cumulatively for an offense and its predicate offense.

¶ 56    Next, we find it counterintuitive to be barred from searching sentencing provisions for legislative intent when the United States Supreme Court states that our legislature may impose cumulative sentences regardless of whether two statutes proscribe the same conduct. See *Payne*, 98 Ill. 2d at 54-55 (citing *Hunter*, 459 U.S. at 368-69). If cumulative sentences are intended, they are likely to be found in sentencing provisions. Moreover, this sentencing provision falls within Title III of the Criminal Code, which sets forth "Specific Offenses." It also appears immediately after section 33A-2, which sets forth the offense for which defendant was convicted. Section 33A-3(d)(xii) plainly and clearly demonstrates a legislative intent to allow a defendant to be convicted of and sentenced for both armed violence and "*the* predicate offense." (Emphasis added.) 720 ILCS 5/33A-3(d)(xii) (West 2020). In light of this clear statement of intent, we find the one-act, one-crime rule does not require reversal.

¶ 57                          III. CONCLUSION

¶ 58    We affirm the trial court's judgment.

¶ 59    Affirmed.

*People v. Vences*, 2023 IL App (4th) 220035

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Woodford County, No. 20-CF-79; the Hon. Charles M. Feeney III, Judge, presiding. |
| **Attorneys for Appellant:** | Nicholas Curran, of Kathleen T. Zellner & Associates, P.C., of Warrenville, for appellant. |
| **Attorneys for Appellee:** | Gregory Minger, State's Attorney, of Eureka (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |