2025 IL App (4th) 240947-U

NO. 4-24-0947

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
October 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| MEKYEL K. DIXON, | ) | No. 21CF604 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the trial court did not err when it denied defendant's motion to suppress evidence and (2) the aggravated unlawful use of a weapon statute is not facially unconstitutional.

¶ 2    Following a bench trial, defendant, Mekyel K. Dixon, was convicted of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1) (West 2020)), a Class 4 felony, and resisting a peace officer (*id.* § 31-1(a)), a Class A misdemeanor. On appeal, defendant argues (1) the trial court erred when it denied his motion to suppress evidence and (2) the AUUW statute is facially unconstitutional under the second amendment of the United States Constitution (U.S. Const., amend. II) and the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The State responds (1) the court properly denied his motion to suppress evidence and (2) the AUUW is not facially unconstitutional under the Illinois Supreme Court's decision in *People v. Thompson*, 2025 IL 129965. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5         On July 27, 2021, the State charged defendant with one count of AUUW (720 ILCS 5/24-1.6(a)(1) (West 2020)) (count I) and one count of resisting a peace officer (*id.* § 31-1(a)) (count II). Count I alleged defendant knowingly carried a Glock 19 9-millimeter handgun in a vehicle "at a time when he was not on his own land, own abode or fixed place of business, and that the handgun was uncased, loaded and immediately accessible at the time of the offense," and he had not been issued a valid firearm owners identification (FOID) card or concealed-carry license (CCL). Count II alleged defendant knowingly resisted Sergeant Justin Spaid of the Springfield Police Department in the performance of an authorized act within his official duties when defendant pulled away from him during an investigation of defendant.

¶ 6                                    B. Pretrial Motions

¶ 7         On April 25, 2023, defendant filed a motion to suppress evidence obtained during the traffic stop which precipitated the charges in this case. In the motion, defendant asserted he was unlawfully detained and searched under the fourth amendment of the United States Constitution (U.S. Const., amend. IV) and sections 107-14(a) and 108-1.01 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-14(a), 108-1.01 (West 2020)). Accordingly, defendant requested the trial court suppress all evidence obtained by Sergeant Spaid and other law enforcement officers incident to defendant's allegedly unlawful detention.

¶ 8         In July 2023, defendant also filed a motion to dismiss count I. In the motion, defendant asserted the AUUW statute was facially unconstitutional under the second amendment of the United States Constitution (U.S. Const., amend. II) and the Supreme Court's decision in *Bruen*. Specifically, defendant argued the conduct proscribed by the AUUW statute was not

consistent with a historical tradition of firearm regulation, as required under *Bruen*.

¶ 9         The trial court conducted a hearing on defendant's pretrial motions in December 2023. At the hearing, defendant called Sergeant Spaid to testify.

¶ 10        Sergeant Spaid testified he worked for the Springfield Police Department and was assigned to the street crimes unit. On July 25, 2021, at 8:43 p.m., Sergeant Spaid was patrolling the 1800 block of South Pope Street in Springfield with two other officers, John Von Behren and Colton Redding. Sergeant Spaid observed a vehicle traveling northbound in front of him when the driver "suddenly pulled off, parked on the sidewalk," and exited. Sergeant Spaid identified defendant as the driver. At this time, either Officer Von Behren or Officer Redding activated the lights of the patrol car in which Sergeant Spaid was the passenger.

¶ 11        Defendant then introduced Defendant's exhibit No. 2, a disk containing footage from Officer Redding's body-worn camera, which was admitted into evidence and published to the court with no objection. In the footage, after the officers exit the patrol car and approach defendant, Sergeant Spaid can be seen speaking with defendant while Officer Redding shines a flashlight into defendant's vehicle. At one point, Sergeant Spaid says, "Hey, you know what man," and reaches out to grab defendant's arm. Simultaneously, Sergeant Spaid reaches out and touches the front of defendant's waistband and shouts that defendant has a gun. Defendant immediately breaks free of Sergeant Spaid and runs several feet before Officer Redding forces him to the ground. Sergeant Spaid then deploys his Taser, and the officers place defendant in handcuffs while he is facing down on the pavement. The officers then turn defendant on his side and recover a handgun from inside his underwear.

¶ 12        Sergeant Spaid testified, when the group of officers approached defendant's vehicle, defendant had already exited and was walking toward a nearby residence. Sergeant Spaid

acknowledged he observed a parking violation but no other traffic or criminal offenses. When the officers approached defendant, he "angled his body away" from the officers and "looked down at his front waistband." The officers ordered defendant to stop and come back to his vehicle, and he complied. Sergeant Spaid told defendant to stop because he wanted to discuss the vehicle on the sidewalk. Further, Sergeant Spaid wanted to know if defendant had a valid reason for parking on the sidewalk, such as a family emergency. According to Sergeant Spaid, defendant appeared "stiff and nervous."

¶ 13        Sergeant Spaid explained that at this point, he wanted to pat down defendant's person because of his nervous demeanor and his act of looking down at his waistband before complying with the order to come back. In his professional experience, this indicated that an individual may be carrying a concealed weapon. Moreover, Sergeant Spaid observed "an imprint" in defendant's front waistband as he returned to his vehicle. Prior to attempting the pat- down, Officer Redding was using a flashlight to look inside defendant's vehicle, and Officer Von Behren was in the patrol vehicle. Upon realizing defendant may have a weapon, Sergeant Spaid snapped toward Officer Redding to get his attention and began to attempt a pat down of defendant's person. At this time, defendant ran away. Following the physical altercation, Officer Redding retrieved a firearm from "further down" defendant's pants. On cross-examination, Sergeant Spaid testified that when he saw defendant park on the sidewalk, he believed it to be a violation of the Illinois Vehicle Code (625 ILCS 5/1-100 *et seq.* (West 2020)) and potentially an ordinance violation. Specifically, defendant had parked the vehicle straddling the entire sidewalk, which Sergeant Spaid did not believe complied with the law. Sergeant Spaid explained that instead of merely ticketing defendant e, they chose to speak with him because their preference was that the vehicle be moved. Sergeant Spaid testified he used his flashlight to shine on the area of defendant's

waistband, which allowed him to observe "different angles" and "this bulge in the center of his waist, which is where people frequently carry handguns." In this case, Sergeant Spaid observed a bulge that was "irregularly horizontal" to defendant's clothing in that area, which was consistent with the shape of the "grip" or "back end" of a firearm. Sergeant Spaid did not immediately conduct the pat down when he made these observations because he wanted to have Officer Redding's attention and assistance to prevent a one-on-one physical encounter with defendant in the event he was, in fact, carrying a concealed weapon.

¶ 14        The State then introduced People's exhibit No. 2, a disk containing Sergeant Spaid's body-worn camera footage, which was admitted into evidence and published to the court with no objection. In the footage, after exiting the patrol vehicle, Sergeant Spaid tells defendant to "hold up" because he wants to discuss the "sidewalk parking job." As Sergeant Spaid approaches defendant, who is at this point walking toward the house, defendant can be seen looking downward before turning away and walking back toward his vehicle. Sergeant Spaid then asks defendant for his name and driver's license, and he provides his name but explains he does not have his license with him. During the conversation, Sergeant Spaid continues to direct his flashlight at defendant's front waist area. Officer Redding turns off his flashlight, and defendant turns to stand perpendicular to Sergeant Spaid. Sergeant Spaid then asks, "Hey, I'll tell you what man, you got anything on you we need to know about?" while grabbing onto defendant's arm. Defendant then breaks free from Sergeant Spaid, and Sergeant Spaid's body-worn camera falls to the ground.

¶ 15        Following counsels' arguments, the trial court denied defendant's motion to suppress evidence The court first determined the officers were justified in stopping defendant to investigate the parking violation of blocking the sidewalk. The court also found Sergeant Spaid had reasonable suspicion to believe defendant was armed and dangerous based on his observation

that the bulge in defendant's waist area was consistent with the shape of a firearm through his white T-shirt, which justified the pat down of defendant's person for officer safety. The court noted it also observed the bulge during its viewing of Sergeant Spaid's body-worn camera footage.

¶ 16                                    C. Bench Trial

¶ 17        The trial court conducted a bench trial in March 2024.

¶ 18        The State first called Sergeant Spaid, who testified consistently with his testimony at the motion to suppress hearing regarding the traffic stop leading to defendant's arrest. People's trial exhibit No. 1, which was the disk containing Sergeant Spaid's body-worn camera footage that was also admitted at the motion to suppress hearing, was admitted into evidence and published with no objection. The trial court also admitted People's trial exhibit No. 2, which was a Glock 19 9-millimeter handgun, over defendant's renewed objection. Sergeant Spaid testified this was the firearm he and Officer Redding retrieved from defendant after defendant was tackled to the ground during their altercation. Sergeant Spaid testified that upon retrieving the firearm, he found it was loaded and requested dispatch to investigate whether defendant had a CCL or FOID card. Based on the information Sergeant Spaid received from dispatch, he placed defendant under arrest.

¶ 19        The State next called Officer Redding. (We note Officer Redding, at the time of the trial, had been promoted to detective; we will continue to refer to him as Officer Redding for consistency.) Officer Redding testified he was present during the encounter with defendant on July 25, 2021, which was precipitated by defendant parking his vehicle on the sidewalk. While interacting with defendant, who was on his right side, Officer Redding noticed a "bulge in front of [defendant's] waistband." Officer Redding immediately reached out and touched it, and he felt that it was consistent with a firearm. Simultaneously, Sergeant Spaid tried to grab hold of defendant. At this point, defendant pulled away from the officers and tried to flee on foot. Officer

Redding ran after him, grabbed hold of him, and they hit the ground. Sergeant Spaid deployed his Taser, and the officers handcuffed defendant. Officer Redding retrieved a Glock 19 handgun from defendant's underwear. Based on Officer Redding's training and experience, the Glock 19 was a real handgun, the magazine of which was loaded with ammunition. The trial court then admitted into evidence and published People's trial exhibit No. 3, which was a disk containing footage from Officer Redding's body-worn camera. (We note this was the same body-worn camera footage that was admitted at the motion to suppress hearing as defendant's exhibit No. 2.) Officer Redding further testified he learned, after contacting central dispatch, that defendant did not have a valid CCL or FOID card. On cross-examination, Officer Redding acknowledged he did not notice the bulge near defendant's front waistband until he was standing near defendant and Sergeant Spaid called his attention to it. Officer Redding explained that once he noticed it, he believed the "shape" of the bulge was consistent with a firearm.

¶ 20     Finally, the State read into the record Joint exhibit No. 2, which was a stipulation that records obtained from the Illinois State Police and marked as People's exhibit Nos. 4 (FOID card abstract for defendant) and 5 (CCL abstract for defendant) were authentic and accurate. The trial court admitted all three exhibits into evidence with no objection. People's exhibit No. 4 indicated defendant initiated a FOID card application in 2019 but never had an active FOID card. People's exhibit No. 5 indicated defendant had no records on file pertaining to a CCL.

¶ 21     At the close of the State's evidence, defendant moved for a directed verdict, asserting the evidence was insufficient to convict him on counts I and II. Defendant additionally renewed his motion to dismiss count I as unconstitutional under *Bruen*. The trial court denied defendant's motions, and defendant did not present any evidence or testimony.

¶ 22     The trial court found defendant guilty on both counts. Specifically, with respect to

count I, the court found officers properly investigated defendant for illegally parking on the sidewalk, which "turned into *** a valid stop and frisk." As to count II, the court found defendant failed to comply with the officers' attempted pat down and resisted their efforts to lawfully gain possession of his weapon.

¶ 23                              D. Posttrial Proceedings and Sentencing

¶ 24          Following the bench trial, defendant filed a posttrial motion, asserting the trial court erred when it denied his motions to suppress evidence and dismiss count I. Specifically, defendant argued the officers lacked reasonable suspicion or probable cause to stop and search him, and, furthermore, it was not readily apparent the bulge that the officers identified was a firearm. Furthermore, as he previously argued, the AUUW statute was facially unconstitutional under *Bruen*. Defendant requested the court either grant him a new trial or vacate his conviction for AUUW and declare the statute unconstitutional. The court denied the motion. Upon denying defendant's posttrial motion, the court sentenced defendant to 15 months in prison on count I and 59 days of time served on count II. Defendant filed a motion to reconsider his sentence, which was denied after a hearing.

¶ 25          This appeal followed.

¶ 26                              II. ANALYSIS

¶ 27          On appeal, defendant's arguments are twofold. First, defendant argues the trial court erred when it denied his motion to suppress evidence because the alleged bulge observed by officers did not provide the requisite reasonable suspicion that defendant was armed and dangerous to justify a pat down. Second, defendant asserts the AUUW statute is unconstitutional under *Bruen* and the second amendment, and, therefore, his conviction must be vacated.

¶ 28          The State responds the trial court properly denied defendant's motion to suppress

evidence because the officers had reasonable suspicion to stop defendant for illegally parking on the sidewalk and during this lawful encounter, they observed a bulge in his T-shirt that was consistent with a concealed firearm and justified a pat down for officer safety. The State further responds that the AUUW statute is not unconstitutional under *Bruen*, as confirmed by the Illinois Supreme Court's holding in *Thompson*.

¶ 29　　　　　We conclude the trial court properly denied defendant's motion to suppress evidence and the AUUW statute is not unconstitutional. Accordingly, we affirm the court's judgment.

¶ 30　　　　　　　　　　　　A. Motion to Suppress

¶ 31　　　　　We first address defendant's argument the trial court erred when it denied his motion to suppress evidence, specifically, the firearm recovered during the traffic stop. Defendant argues the officers' alleged observation of a bulge in the front of his waistband did not justify a pat down based on reasonable suspicion he was armed and dangerous. The State responds the officers' testimony, along with the video evidence, showed the bulge observed in defendant's waistband was consistent with the shape of a firearm and therefore supported a pat down based on reasonable suspicion defendant was armed and dangerous. We agree with the State.

¶ 32　　　　　　　　　　　　1. *Applicable Law*

¶ 33　　　　　On appeal from the trial court's denial of a motion to suppress evidence, this court employs a bifurcated standard of review. *People v. Vences*, 2023 IL App (4th) 220035, ¶ 30. We will defer to the court's findings of fact unless they are against the manifest weight of the evidence. *Id.* The court's ultimate decision to grant or deny the motion is a question of law reviewed *de novo*. *Id.*

¶ 34　　　　　Under the fourth amendment of the United States Constitution (U.S. Const., amend.

IV), as applied to the states through the fourteenth amendment (U.S. Const., amend. XIV), "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Accordingly, the trial court generally will not admit any evidence obtained in violation of the fourth amendment under the "fruit of the poisonous tree" doctrine, which is derived from the exclusionary rule. *People v. Bonilla*, 2018 IL 122484, ¶ 35. "[T]he prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." (Internal quotation marks omitted.) *Id.* Typically, to be reasonable under the fourth amendment, law enforcement must obtain a warrant supported by probable cause to search an individual's person. See *People v. Manzo*, 2018 IL 122761, ¶ 28.

¶ 35        An exception to the fourth amendment's warrant requirement, the *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1, 21 (1968)), permits a police officer to briefly detain an individual upon a reasonable, articulable suspicion that he has committed a crime. See 725 ILCS 5/107-14 (West 2020) (codifying *Terry* stops). Additionally, under *Terry*, "when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine whether the person is in fact carrying a weapon." *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001); see 725 ILCS 5/108-1.01 (West 2010) (codifying pat down for officer safety upon reasonable suspicion the individual is armed and dangerous). To be justified in such a pat down, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Sorenson*, 196 Ill. 2d at 433. In considering whether an officer had the requisite suspicion to justify a pat down for safety, courts consider the totality of the

circumstances, including (1) whether the officer was outnumbered, (2) environmental factors, such as the time of day, (3) suspicious movements or behavior of the suspect, and (4) the officer's "experiences and subjective opinion." *People v. Fox*, 2014 IL App (2d) 130320, ¶¶ 20-22. "While an officer's experiences and subjective opinion may be considered, they must be tied to some other, specific circumstance that justifies a reasonable, articulable suspicion of danger." *Id.* ¶ 22.

¶ 36                                    2. *This Case*

¶ 37            We conclude, based on the totality of the circumstances, the officers had a reasonable, articulable suspicion that defendant was armed and dangerous and were therefore justified in conducting a pat down of defendant's person for weapons. First, we note defendant does not assert the officers' initial detention of him to investigate the parking violation was unlawful and instead challenges only the search of defendant's person. Here, Sergeant Spaid testified that after defendant exited his illegally parked vehicle, he observed him look down toward his waistband and look away. This observation was supported by the body-worn camera footage admitted at both the motion to suppress hearing and at trial. Although defendant claims Sergeant Spaid was behind him and could only speculate where he was looking, our review of Sergeant Spaid's body-worn camera footage—around 00:34 in People's Exhibit No. 2 from the motion to suppress hearing—shows he can be observed from the side looking downward in the direction of his waistband. Furthermore, at the hearing, Sergeant Spaid described defendant as "stiff and nervous" over the course of their interaction. Both Sergeant Spaid and Officer Redding testified that in their professional experience, individuals often concealed weapons in the waistband of their pants. Most importantly, both officers observed a bulge in defendant's waistband that was consistent with the shape of a firearm. Sergeant Spaid specifically described the shape of the bulge as "irregularly horizontal" to defendant's clothing in that area, which was consistent with the shape

- 11 -

of the "grip" or "back end" of a firearm.

¶ 38　　Defendant asserts that no bulge is visible in the body-worn camera footage admitted at the motion to suppress hearing and, citing *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29, maintains this court should not defer to the trial court's factual findings that are based solely on the video evidence. Even if we were to apply a less deferential standard to such findings, upon this court's review of People's exhibit No. 2 (Sergeant Spaid's body-worn camera footage), around 00:54 to 01:00, a bulge is visible directly above defendant's waistband, where it is pulling away and tenting against his white T-shirt. It is also visible in defendant's exhibit No. 2 (Officer Redding's body-worn camera footage), around 01:03. Although this court cannot discern, from the video evidence alone (which we note occurred in the evening hours), the exact shape of this bulge, both officers were in a position to observe—from a close distance—the shape of the bulge, and both insisted, based on their training and experience with the street crimes unit, it was consistent with the shape of a firearm. The trial court, in considering the video evidence *combined* with the officers' testimony, concluded this testimony was credible. We find nothing in the video evidence which contradicted or otherwise rebutted that testimony. Accordingly, we defer to the court's credibility determination regarding the officers' testimony of the shape of the firearm.

¶ 39　　Based on this record, the trial court's factual finding that defendant had a firearm-shaped bulge in his waistband was not against the manifest weight of the evidence. Accordingly, the court did not err when it concluded the officers had reasonable suspicion to believe defendant was armed and dangerous and denied defendant's motion to suppress evidence.

¶ 40　　　　　　　　　B. Constitutionality of the AUUW Statute

¶ 41　　We next address defendant's argument the AUUW statute is facially unconstitutional under the second amendment of the United States Constitution (U.S. Const. 1970,

amend. II) and *Bruen*. Specifically, defendant argues there is no analogous history and tradition to justify Illinois's requirement that he obtain a FOID card and CCL to exercise his constitutional right to bear arms. The State responds the AUUW statute is not facially unconstitutional, as recently announced by our supreme court in *Thompson*. We agree with the State.

¶ 42        In *Thompson*, 2025 IL 129965, ¶ 1, the defendant was convicted of AUUW. On appeal to the supreme court, the defendant argued the AUUW statute was facially unconstitutional "as impermissibly restricting law-abiding citizens' right to openly carry handguns in public and enforcing an ahistorical double licensing regime that mandates CCLs and FOID cards." *Id.* ¶ 13. The supreme court explained that "the text-and-history standard—adopted in *Heller* and clarified in *Bruen*—requires courts faced with second amendment challenges to 'assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.' " *Id.* ¶ 32 (quoting *Bruen*, 597 U.S. at 26). However, the *Bruen* court also distinguished "may issue" firearm licensing regimes—which "grant[ ] the government discretion to deny licenses based on a perceived lack of need or suitability"—from "shall issue" regimes— " 'where authorities must issue [CCLs] whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.' " *Id.* ¶¶ 29-30 (quoting *Bruen*, 570 U.S. at 13-14). In applying *Bruen* to the defendant's constitutional challenge in *Thompson*, the supreme court reasoned as follows:

> "[T]he United States Supreme Court expressly held in *Bruen* that shall-issue firearm licensing regimes, like the one enacted in Illinois, comport with the second amendment because they do not contain the problematic features of New York's licensure regime—the unchanneled discretion for licensing officials and the special-need requirement—which effectively deny the right to carry handguns for

self-defense to many ordinary, law-abiding citizens. Illinois's CCL and FOID card regulations do not have a special-need requirement and contain only narrow, objective, and definite standards guiding licensing officials rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion. Contrary to [the] defendant's assertion, *Bruen*'s juxtaposition of may-issue and shall-issue regimes was deliberate, and it illustrates why the former are facially unconstitutional and the latter are not. [*Bruen*, 597 U.S. at 80.] ('States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.')." *Id.* ¶ 42.

Accordingly, because Illinois employs a "shall issue" licensing regime for CCLs and FOID cards, the supreme court found it was unnecessary to undertake a text-and-history analysis in evaluating the constitutionality of the AUUW statute. *Id.* ¶ 45. Accordingly, the *Thompson* court concluded Illinois's "shall issue" regime did not violate the second amendment and affirmed defendant's conviction for AUUW. *Id.* ¶¶ 45, 54.

¶ 43     Here, defendant's constitutional challenge to the AUUW statute is nearly identical to the one brought by the defendant in *Thompson*, and this court is bound to reject it for the same reasons set forth therein. Therefore, we affirm the trial court's judgment.

¶ 44                                III. CONCLUSION

¶ 45     For the reasons stated, we affirm the trial court's judgment.

¶ 46     Affirmed.